## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

J L,

                    Plaintiff,

       vs.

Township High School District 113, Kathryn Anderson, and Britnee Kenyon,

                 Defendants.

Case No. 1:26-cv-02395

**JURY TRIAL DEMANDED**

### I. Introduction/Nature of Action

This civil action arises from a multi-year pattern in which Township High School District 113 received repeated notice that a teacher, Defendant Britnee Kenyon, was engaging in unlawful disclosures, retaliation, and boundary violations involving a then-minor student with a documented disability, yet the District failed to take reasonable steps to intervene. Despite multiple warnings, escalating concerns with administrators at every supervisory level, and numerous opportunities to protect the student, the District declined to conduct meaningful investigations, impose discipline, supervise the employee, or restrict her access to vulnerable students. Instead, the District displaced the then-minor student from her educational environment, concealed or minimized the misconduct, and elevated administrators who knowingly failed to act.

1.      Plaintiff, now of the age of majority, brings this action to redress violations of her child's rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and 42 U.S.C. § 1983, which occurred while she was underage. These violations include the District's denial of equal access to educational programs; deliberate indifference to a known and obvious risk of harm to a student with a documented disability; retaliation for protected activity; unlawful disclosure of

protected student information; and the maintenance of policies, practices, and customs that foreseeably caused and perpetuated ongoing harm.

2. Over the course of several years, Defendants received repeated reports that Defendant teacher Kenyon had (1) distributed sexually explicit materials to a minor student; (2) disclosed confidential information to students, parents and community members without consent; (3) retaliated against a student following protected complaints; and (4) engaged in inappropriate relationships, communication patterns and interactions with students. Rather than investigate these concerns properly or take corrective action, District officials, including then-Principal Kathryn Anderson and Assistant Principal/504 Coordinator Dan Chamberlin, minimized or concealed the misconduct, shifted blame onto the minor student, removed the student from educational opportunities, and ultimately promoted Anderson to a central administrative role overseeing Human Resources and public records compliance.

3. As a result of Defendants' actions and omissions, Plaintiff JL, who has a documented history of anxiety, depression, and self-harm, suffered severe emotional distress, social isolation, bullying, loss of educational access, academic regression, and deterioration in mental health. Plaintiff and her parents exhausted every internal pathway available to resolve these concerns, including dozens of written communications, in-person meetings, and outreach to administrators, board members, and external investigators.

4. This lawsuit concerns a school district that repeatedly chose to protect an employee and its own institutional interests rather than safeguard a vulnerable student, turning preventable misconduct into systemic harm that was both foreseeable and avoidable.

## II. Jurisdiction and Venue

5. This action arises under the Constitution and laws of the United States, including the Fourteenth Amendment and 42 U.S.C. § 1983, as well as Section 504 of the Rehabilitation

Act, 29 U.S.C. § 794. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3)-(4).

6. This Court has supplemental jurisdiction over Plaintiff's related state-law claims, including invasion of privacy, willful and wanton misconduct, and violations of the Illinois School Student Records Act, pursuant to 28 U.S.C. § 1367(a), because those claims arise from the same case or controversy as the federal claims, arise from a common nucleus of operative fact.

7. This Court has personal jurisdiction over Defendant Kenyon because she resides and is employed in Illinois; all acts and omissions giving rise to the claims against her occurred within Illinois; and she purposefully directed her conduct toward Plaintiff in this District. Kenyon intentionally disclosed confidential student information, engaged in retaliatory conduct, and undertook actions that foreseeably caused harm within this District. Kenyon acted under color of state law as an employee of Township High School District 113.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because all Defendants reside in this District and a substantial part of the events and omissions giving rise to these claims occurred within the Northern District of Illinois, Eastern Division, including the distribution of sexually explicit materials to a minor student, retaliation, disclosure of confidential student information, mishandling of disability accommodations, and the District's subsequent concealment and obstruction.

9. Township High School District 113 is a public body located within this District and subject to suit under 42 U.S.C. § 1983 and Section 504, and its Board of Education serves as the final policymaking authority for the matters relevant to this action.

3

### III. Parties

10.     Plaintiff was a minor student at Deerfield High School ("DHS") during the events described herein and is now a freshman at the University of Kansas. At all relevant times to this lawsuit, the Plaintiff resided in Lake County, Illinois.

11.     Plaintiff has a documented mental-health disability, including severe anxiety, depression, a history of self-harm, and was supported by a Section 504 plan throughout high school. Plaintiff is an individual with a disability within the meaning of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

12.     Defendant Township High School District 113 ("District") is a public school district organized under the laws of the State of Illinois, operates Deerfield High School in Lake County, Illinois, and is a recipient of federal financial assistance within the meaning of Section 504. The District is responsible for hiring, training, supervising, and disciplining staff, and for establishing and enforcing policies relating to student safety, confidentiality, and disability accommodations.

13.     Defendant Kathryn Anderson ("Anderson") served as Principal of Deerfield High School during the events described herein and had direct responsibility for enforcing District policies, ensuring student safety, responding to misconduct, and overseeing Section 504 implementation at the building level. Upon information and belief, Defendant Anderson resides in Cook County. In June 2025, the District promoted Anderson to Deputy Superintendent and Chief Human Resources Officer and designated her as the District's FOIA Officer. At all relevant times, Anderson acted under color of state law.

14.     Defendant Britnee Kenyon ("Kenyon") is a teacher and theater director at Deerfield High School. Upon information and belief, she is a resident of Cook County. At all relevant times, she acted under color of state law in the scope of her employment. Among other

things, Kenyon publicly disclosed confidential student information, that caused harm to Plaintiff. Plaintiff asserts claims against Kenyon in her individual capacity.

15. At all relevant times, Defendants had actual knowledge of Plaintiff's disability, mental-health, history, and accommodations.

### IV. Factual Allegations

16. For over a decade and during the events at issue, Plaintiff and her parents were deeply involved in the DHS community, volunteering extensively and helping raise over $1 million to support athletic programs, extracurricular activities, and student initiatives. Plaintiff's parents were known to staff and administrators as highly engaged, supportive parents who contributed significant time and resources to the school. This underscores both the credibility of their concerns and the magnitude of the District's breach of duty when it chose to ignore, conceal, and mishandle the violations involving Plaintiff.

<u>Initial Incidents and Early Violations</u>

17. During Plaintiff's freshman year, on November 9, 2021, Plaintiff's mother emailed Kenyon (marked confidential) that Plaintiff was struggling with her mental health and requested basic support and understanding with regards to upcoming musical tryouts. Defendant Kenyon responded by thanking her and calling her a "great mom," but ignored the plea and provided no consideration or adjustment. As Plaintiff's needs intensified, her parents sought assistance from Dan Chamberlin (as Plaintiff's 504 Coordinator) and other administrators, who ensured that Plaintiff received accommodations and consideration for her condition. Kenyon later expressed resentment that Plaintiff's parents had gone to administrators, a fact she admitted in her later personnel lawsuit.

18. In spring 2023, when Plaintiff was a 15-year-old sophomore, Kenyon assigned Plaintiff "alternative materials" after Plaintiff expressed discomfort participating in a staged

Columbine performance in Drama 2 class, less than a year after the Highland Park July 4ᵗʰ parade mass shooting. Multiple members of Plaintiff's family attended that parade and experienced distress from the tragedy, which contributed to Plaintiff's discomfort.

19.    An alternative assignment was provided after the Plaintiff's parents declined then-Superintendent Dr. Bruce Law's suggestion to file a written formal curriculum objection. Dr. Law agreed that the Columbine assignment was in poor taste but refused to engage with Anderson or Kenyon and instead pushed for Plaintiff's parents to file an objection, offering no assurance that Plaintiff's name or the family's name would be kept out of it. Plaintiff was bullied by peers for opting out, including taunts to the words or effect that she was not "up for the acting challenge." Plaintiff's parents declined to file the objection to avoid further scrutiny of Plaintiff.

20.    On May 4, 2023, without parental knowledge or consent, Kenyon provided Plaintiff with written materials containing graphic descriptions of sexual acts, including explicit narratives of sexual violence and sexual arousal, group sexual activity, sexual assault, coercion, rape, degradation, and a vivid description of a teenager inducing her own abortion in a bathroom. These materials were wholly unrelated to any legitimate educational curriculum.

21.    Despite being notified of this incident, District leadership took no corrective action, allowed Kenyon to remain in the classroom, and permitted her continued direct contact with Plaintiff, leading to further harm.

22.    Dr. Law acknowledged the seriousness of the incident, including the potential need to involve law enforcement and the risk that the materials could be raised publicly at a school board meeting. He expressly assured the Plaintiff's parents that the matter would be handled appropriately and in accordance with District obligations.

23.    Dr. Law also made assurances to the Plaintiff's parents, in light of Plaintiff's documented disability and the lost opportunity to participate in the staged performance, about how

Plaintiff's future participation in theater program would be handled and stressed the importance of demonstrating that there would be no repercussions or retaliation. Plaintiff's parents shared Dr. Law's statement with a school board member. As a result of opting out of the Columbine staging, Plaintiff was removed and ostracized from the classroom for several weeks. Under pressure from Anderson and Kenyon, Dr. Law later backtracked on his assurances regarding Plaintiff's continued theater involvement.

24. Around the time of the sexually explicit materials incident, a separate issue arose involving Plaintiff's sibling. Plaintiff's mother privately messaged another parent *via* Facebook. Without permission and without any legitimate purpose, that parent forwarded the message to Anderson, who then shared it with Chamberlin, prompting him to pull Plaintiff out of class and show her a copy of the message. The communication was a private parent-to-parent message, not directed to school officials and not pertaining to Plaintiff, but about Plaintiff's sibling. This incident foreshadowed Chamberlin's later violations of Family Educational Rights and Privacy Act (FERPA), the Illinois School Students Records Act (ISSRA), and Plaintiff's privacy rights. Based the mishandling of these private communications, among other things, the District had earlier notice of serious deficiencies in handling of sensitive information.

Retaliation, Privacy Breaches and FOIA Issues

25. Defendant Kenyon later claimed in her personnel lawsuit that Plaintiff had "asked for" the sexually explicit materials because she expressed interest in women's-issues-related topics. Defendant Kenyon never acknowledged wrongdoing, insisted the materials were appropriate, and claimed that she was "humiliated" by being required to privately apologize to Plaintiff's parents. The District neither corrected or repudiated these statements nor imposed formal discipline. A school board member later informed Plaintiff's parents that several members favored terminating

Kenyon, but Dr. Law opposed termination due to "censorship" concerns, and Anderson advocated on Kenyon's behalf.

26.     After learning that Defendant Kenyon had assigned Plaintiff sexually explicit materials, Plaintiff's parents later discovered – confirmed years later through a Freedom of Information Act (FOIA) request – that Defendant Kenyon had discussed the incident in detail with two parents who otherwise had nothing to do with the incident. At the time, Plaintiff's parents raised concerns to both Anderson and Chamberlin that Kenyon was disclosing sensitive information about Plaintiff with these individuals. The disclosure resulted in Plaintiff's parents being pushed out of a school Friends-of-the-Arts parent group in an act of social retaliation. One of the parents emailed the Plaintiff's parents to announce their removal and explained it was because they had been "told" that they were not a "friend of the arts." Despite clear evidence that Defendant Kenyon was sharing nonpublic student information (and information related to Plaintiff's parents and their attempts to rectify the problems) with individuals outside the school and outside any legitimate educational purpose, the District ignored Plaintiff's concerns, performed no investigation, and took no action.

27.     A subsequent FOIA response confirmed that Kenyon disclosed Plaintiff's classroom participation, including Plaintiff's refusal to participate in the sensitive school-shooting assignment, to these same parents, who had no children in Plaintiff's class and no legitimate educational interest. The only possible source for this information was Kenyon. In one email exchange, one of these parents referred to Plaintiff's parent as "crazy" and specifically asked Kenyon about Plaintiff's statements in class.

28.     These disclosures violated FERPA, ISSRA, and District policies requiring staff to safeguard student confidentiality. Discussing a student's private decisions and related circumstances

with unrelated adults, particularly in a context likely to invite speculation or ridicule, lacked any educational purpose, and constitutes a serious breach of professional ethics and District policy.

29.     Following musical auditions in August 2023, Plaintiff's parents raised concerns of retaliation connected to their prior reporting. Anderson initiated an investigation, but she did not review relevant emails nor interview witnesses. She relied solely on statements from Kenyon and a colleague, and imposed no corrective action.

30.     In late fall 2023, Kenyon's father confronted and attempted to intimidate the Plaintiff's parents at a school musical performance. They reported the incident to Defendant Anderson, who confirmed it *via* video. When Plaintiff's parents expressed concern for Plaintiff's safety given the retaliation investigation and the conduct of Kenyon's father, Anderson responded that there was nothing she could do and that they should "go to HR," if dissatisfied with Defendant Anderson's handling. The District took no steps to protect Plaintiff or impose consequences on Kenyon.

Other Complaints, Social Media Misconduct

31.     Despite Kenyon's popularity among certain parents and students, the District's legal obligations were not discretionary. Multiple concerns about her professional boundaries were repeatedly reported to leadership. Instead of investigating or imposing corrective measures, the District prioritized Kenyon's favored status over student safety and privacy. Defendants' reliance on Kenyon's popularity as justification for inaction reflects discretionary favoritism, not compliance with mandatory duties to investigate misconduct and protect students from boundary violations.

32.     During the following school year, two months after the October 7, 2023, Hamas terrorist attacks in Israel, Kenyon posted anti-Israel content on her public social media accounts, which were linked to school platforms and followed by hundreds of DHS students. A subsequent District investigation revealed extensive additional misconduct, including Snapchat discussions

about birth control with a student, partially undressed photos of Kenyon in bed, and disclosures about her past sexual assault.

33.     Current District leadership is in possession of extensive documentation of Kenyon's social-media activity, including material unrelated to Plaintiffs. Board members acknowledged to Plaintiff's parents that the volume and nature of these posts raised serious concerns regarding boundaries and student safety. Despite this knowledge, the District did not disclose its findings to affected families or the school community, preventing parents, including Plaintiff's, from understanding the risks posed to students.

34.     Neither Plaintiff nor her parents viewed Kenyon's posts. In Defendant Kenyon's personnel meeting, District officials told Kenyon that Plaintiff's parents were not involved in reporting the social-media issues. Kenyon noted in her lawsuit that she had blocked Plaintiff's parents from her accounts years earlier. The District issued a written disciplinary notice to Kenyon in late 2023. She then took temporary mental health leave due to parent dissatisfaction with the District's handling of the matter and Kenyon's feeling "bullied" online.

35.     Despite taking "mental-health leave," Kenyon was immediately returned to the classroom with no oversight, monitoring, or restrictions. At the time, she had publicly disclosed detailed information about her mental health status on social media and sent similarly detailed emails from her DHS account to students. The District nonetheless restored her to a position of trust and authority over students, including those with significant mental health needs, without implementing any safeguards.

Kenyon's Personal Lawsuit and Privacy Breaches

36.     After learning that Defendant Kenyon's attorney had submitted a FOIA request seeking records relating to Plaintiff's mother, she attempted to provide clarifying information to prevent inaccurate assumptions and to ensure that her daughter was not wrongly blamed for

Kenyon's personnel issues. Plaintiff's parents were deeply concerned that misattribution would further endanger Plaintiff, who was already experiencing severe mental health distress. Kenyon's counsel declined to engage. Defendant Kenyon continued to assert publicly and privately that Plaintiff was responsible for the consequences she faced, despite being informed this was untrue.

37.     Kenyon retaliated against Plaintiff in fall of 2024 by rejecting her application to be Assistant Director for the fall play. Due to the ongoing stress of interacting with Defendant Kenyon, Plaintiff chose not to audition for her senior-year musical, with Plaintiff's parents full support.

38.     Kenyon made no effort to communicate with Plaintiff or her parents to clarify facts, correct assumptions, or prevent escalation, despite having multiple opportunities to do so through District administration, counsel, or neutral channels. Plaintiff's parents made several attempts to provide accurate information, including outreach through legal counsel and direct request for communication. Kenyon ignored these efforts and continued engaging in conduct that reinforced misinformation within the school community, contributing to ongoing harassment and emotional deterioration for Plaintiff.

### Kenyon Sues The District

40.     Kenyon subsequently filed suit against the District. In her publicly filed complaint (*Kenyon v. Board of Ed. for Twp. H.S. Dist. 113 et al*, No. 1:2024 cv 09878 (N.D. Ill.) (Coleman, J.) she unlawfully disclosed Plaintiff's Section 504 plan, questioned the legitimacy of her diagnosis, and criticized her accommodations. Defendant Kenyon identified Plaintiff, despite knowing Plaintiff was then a minor, and named Plaintiff's mother as a Respondent-in-Discovery despite knowing Plaintiff's parents had no role in Kenyon's disciplinary investigation. These actions were retaliatory and intended to intimidate Plaintiff's parents.

11

41. Kenyon did not redact Plaintiff's identifying information, requiring them to retain counsel to move to seal the case. The District made no effort to assist and later attempted to rewrite the record when Plaintiff's parents filed a grievance, despite written evidence the District had taken no action.

42. Months later, identifying details remained online. When Plaintiff informed Anderson, Anderson stated she would contact District counsel, but no follow-up occurred.

43. Kenyon shared details of her lawsuit with other parents and students, triggering renewed bullying and targeted harassment of Plaintiff inside and outside the theater program. One student informed Plaintiff that they would not attend Plaintiff's birthday celebration because of Plaintiff's perceived treatment of Kenyon. Plaintiff's parents reported these incidents, including via an email Kenyon was copied on before returning from mental health leave. No action was taken.

44. Kenyon submitted false and inflammatory allegations that Plaintiff could not rebut because Plaintiff was named as a Respondent-in-Discovery under Illinois law and not as a party to the lawsuit. Kenyon effectively weaponized confidential information about Plaintiff to advance her legal interests while restricting Plaintiff's parents' ability to defend their minor child or protect her privacy, creating litigation prejudice and reputational harm.

45. Kenyon's decision to blame Plaintiff's parents occurred despite her actual knowledge of Plaintiff's mental health history, reflected in Plaintiff's Section 504 plan. Kenyon knew that publicly attributing fault to Plaintiff or Plaintiff's parents would likely trigger renewed bullying, ostracization, and emotional distress. She nevertheless persisted in circulating misinformation to students and parents, prioritizing retaliation for the safety of a vulnerable student. Plaintiff's parents' prior concerns about retaliation were essentially validated in writing. The District took no action.

46. Despite written instructions from District counsel on September 25, 2024, not to engage with Plaintiff or discuss her litigation with students, Kenyon repeatedly violated these directives. She discussed her lawsuit with Plaintiff multiple times, engaged Plaintiff in a 40-minute hallway conversation that left Plaintiff distraught, and discussed the lawsuit with other students on school grounds. She also violated directives regarding senior-video content. Kenyon told Plaintiff she had been "forced" to cast her in school productions, language she also used in her public lawsuit, and suggested Plaintiff could "speak to her counsel," which deeply upset Plaintiff and constituted a profound breach of professional standards. Plaintiff's parents notified Anderson in person and *via* email in April 2025. Anderson and Kenyon blamed Plaintiff for the conversations. No corrective action was taken.

47. Plaintiff's parents repeatedly notified former Superintendent Law, current Superintendent Dr. Chala Holland, and Defendant Anderson, and Chamberlin of fears for Plaintiff's safety, especially after the renewed disclosures, bullying, and escalating retaliation. After the sheriff served Plaintiff's parents at home with Plaintiff present, Plaintiff's mother sent an emotional email to Holland begging for help. The District took no action.

48. After learning of Kenyon's lawsuit, Plaintiff met privately with Chamberlin off-campus to alert him that Plaintiff's disability-related information had been publicly disclosed, Plaintiff's mother expressed fear for daughter's safety and emotional well-being. Chamberlin acknowledged the situation but initiated no safety planning, did not request a 504 meeting, and did not take steps to restrict or monitor Kenyon's contact with Plaintiff. This was yet another opportunity to intervene; again, the District did nothing.

49. Each time Plaintiff's parents raised concern about their daughter's safety, the District's response was identical: they urged Plaintiff's parents to remove Plaintiff from theater classes and extracurricular activities, the only area where she felt joy, rather than place any

restrictions on Defendant Kenyon. Holland, Defendant Anderson and Chamberlin each proposed this "solution" repeatedly. The District consistently sought to displace the minor victim rather than address the problems with the teacher, Defendant Kenyon.

50. Kenyon's conduct was not the result of misunderstanding or poor training. Her actions were intentional, targeted, and malicious. She deliberately shared confidential information with students and parents, knowingly engaged in boundary violations, and persisted even after repeated concerns were raised with District leadership.

51. During this period, District counsel made multiple misleading statements to the Plaintiff's parents' family counsel regarding the status of Kenyon's lawsuit, the District's position, and the extent of Kenyon's disclosures. These misrepresentations caused Plaintiff's parents to rely on incomplete information, incur unnecessary legal expenses, and lose opportunities to protect their daughter earlier.

52. District counsel's statements included assurances that steps had been taken to protect Plaintiff, representations about the District's litigation posture, and claims about limitations in the case's procedural posture. These were later shown to be false. In May 2025, District counsel also disclosed to Plaintiff's parents' counsel that Kenyon had violated directives relating to the senior "confessions" video and Plaintiff's participation, yet this was not communicated to Plaintiff's parents directly. This withholding of information reflects the District's effort to manage litigation optics rather than protect the student at the center of the violations.

53. These interactions form part of a broader pattern in which District administrators and counsel concealed, minimized, or misrepresented critical information, obstructing the Plaintiff's parents' ability to make informed decisions regarding their daughter's safety, educational environment, and legal rights.

54.     Kenyon acted without any legitimate pedagogical purpose when she disclosed confidential information to parents and students, engaged in various social-media communications with minors, and retaliated against students or families who challenged her behavior. These actions were taken for her own personal motives, without authorization, and in direct violation of District policy, mandatory reporting standards, and basic professional norms. Her conduct was deliberate, not negligent, and caused foreseeable harm, exposing her to individual liability under federal and state law.

FOIA Responses and Additional Privacy Violations (Chamberlin and Anderson)

55.     FOIA responses revealed improper conduct by Chamberlin, who forwarded confidential emails from Plaintiff's parents, sent intentionally and exclusively to administrators, to Kenyon without authorization or parent consent. These emails contained sensitive concerns about Kenyon, whom Plaintiff's parents had purposefully excluded due to ongoing boundary issues. Forwarding them to Kenyon breached the expectation of confidentiality, compromised the integrity of any investigation, and exposed student information without any legitimate educational purpose.

56.     At all relevant times, Chamberlin served as Plaintiff's official or *de facto* Section 504 Coordinator. He had heightened responsibilities to protect confidentiality, ensure compliance with accommodations, and safeguard student privacy. His conduct violated FERPA, ISSRA, and District policies prohibiting disclosure of confidential information to individuals without a legitimate educational or investigative need to know. These actions undermined trust, interfered with due process, and represented a clear breach of the District's duty to protect student privacy and maintain the integrity of complaint procedures.

57.     Plaintiff's parents initially sought support from Chamberlin because of his close relationship with Plaintiff but also repeatedly expressed concern that he was being placed in sole

15

control of the situation without adequate oversight. Instead of reallocating responsibility, Anderson allowed Chamberlin to remain the sole point of contact and decision-maker. Although Chamberlin welcomed this role, his lack of boundaries, confidentiality breaches, and failure to implement protective measures compounded the harm to Plaintiff.

58. Chamberlin forwarding or relaying Plaintiff's parents' concerns about Kenyon directly to Kenyon herself created in Kenyon a false and escalating belief that the Plaintiff's parents were "targeting" or "out to get her," a perception that District administrators did nothing to correct and, in fact, exacerbated through continued disclosures. As a direct and foreseeable result of the District's unauthorized and inappropriate disclosures, Kenyon developed retaliatory animus toward Plaintiff's parents that manifested when she subsequently publicly identified Plaintiff in her lawsuit.

59. The District's improper disclosures, failures to supervise, and disregard for predictable consequences set in motion the very harm that occurred. The retaliatory identification of a minor child and disclosure of her protected disability information were the natural and foreseeable outcomes of the District's conduct.

60. Rather than investigating or disciplining Anderson for her repeated failures to address Kenyon's boundary violations, unauthorized disclosures, and resulting harm, the District promoted Anderson from Principal to a central-office role overseeing Human Resources and FOIA compliance. These positions require strict adherence to confidentiality and transparency obligations. Despite her documented failures to protect student privacy and appropriately respond to parent concerns, the District placed her in roles demanding heightened legal and ethical oversight, where she subsequently continued to mishandle complaints and public-records obligations.

61. The decision to elevate Anderson to roles specifically responsible for preventing and remedying the type of misconduct at issue reinforced the very policies and practices that caused Plaintiff's harm. Any attempt by the District to attribute the violations solely to Anderson underscores the District's deliberate indifference, as it knowingly promoted her to positions overseeing confidentiality, discipline, and legal compliance despite a record of failures in those areas.

62. Multiple school board members informed Plaintiff's parents that Anderson actively supported Kenyon and minimized Plaintiff's parents' concerns behind the scenes. Subsequent FOIA productions confirmed that Anderson also forwarded parent communications and internal District emails to Kenyon that should not have been shared, in ways appearing to assist Kenyon in advancing claims adverse to Plaintiff and her parents and/or the District. The decision to promote Anderson despite this conduct demonstrates the District's ratification of the very behavior that harmed Plaintiff.

63. While Kenyon's conduct was the most malicious, it was Anderson's actions, and the District's decision to promote her despite documented concerns, that transformed individual misconduct into systemic harm attributable to the District.

FOIA Obstruction, Anderson's Conflict, PAC Appeal

64. Many violations came to light only because Plaintiff's parents filed FOIA requests. The District never disclosed these incidents voluntarily, despite having a legal obligation to do so. FOIA responses revealed ongoing misconduct, unauthorized disclosures, and administrative failures the District had not investigated or addressed. Because the District produced only a narrow subset of responsive records, these disclosures likely reflect only a snapshot of the underlying misconduct.

65. On September 9, 2025, Plaintiff's parents submitted a FOIA request seeking records related to the investigative report prepared by the District's outside law firm, Kriha Boucek, regarding Plaintiff. The District initially delayed, then denied the request on September 22, 2025. Plaintiff's parent filed an appeal with the Illinois Attorney General's Public Access Counselor (PAC) on September 23, 2025. The PAC determined "Further Action Warranted". The PAC has also issued two additional determinations of "Further Action Warranted" concerning the District's responses to Plaintiff's parent's FOIA requests.

66. The District first delayed its FOIA response claiming it required additional consultation, but later denied the request on entirely different grounds, contradicting its earlier justification. This shift in reasoning is consistent with the District's pattern of attempting to withhold information relating to Plaintiff's privacy violations and reflects deliberate obstruction of public-records access.

67. Without the Kriha Boucek report, Plaintiff cannot determine whether key facts were omitted, minimized, or inaccurately represented. The District invoked exemptions that did not apply, including the deliberative-process exemption, to shield misconduct relating to Plaintiff. The misuse of inapplicable exemptions mirrors the District's broader pattern of delay, nondisclosure, and resistance to transparency.

68. In a separate denial issued on October 6, 2025, the District withheld records by stating only that they contained "a private citizen's concerns about a controversial matter" and that disclosure would constitute "an unwarranted invasion of personal privacy." Illinois FOIA requires citation to a specific exemption and a detailed factual basis; the District did neither. This vague language exemplifies the District's practice of invoking generalized privacy assertions to withhold records, rather than applying statutory exemptions as required. The District's repeated reliance on

unsupported claims, combined with delays and incomplete productions, demonstrates a systemic practice of using FOIA to shield District decision-making from scrutiny.

69. Another FOIA response claimed additional time was required due to the need for staff with "specialized expertise" and because compliance within five business days would "unduly burden" District operations. Ultimately, the District produced only five emails. Reviewing five emails requires no specialized expertise and imposes no burden, indicating the extension was used solely to delay disclosure, consistent with the District's pattern of obstruction.

70. Throughout the FOIA process, the District's FOIA Officer was Anderson, the same administrator directly involved in the underlying privacy violations, who had repeatedly dismissed safety concerns regarding Plaintiff and participated in decisions affecting Plaintiff's access to education. Despite this conflict of interest and the explicit concern raised by Plaintiff's parents, Anderson did not recuse herself. Her dual role compromised the fairness and integrity of the District's FOIA process.

71. After a meeting with former Superintendent Law and former Board President Dan Struck regarding potential retaliation by Defendant Kenyon, Anderson made derogatory and dismissive comments about Plaintiff's parents, demonstrating bias and hostility. This bias carried into both the FOIA and grievance processes and informed her handling of Plaintiff's parents' concerns.

72. Despite this conflict, Anderson also participated in the grievance-appeal process, further undermining neutrality and due process. Anderson's involvement in matters that directly implicated her own conduct explains, in part, the District's pattern of withholding documents, delaying responses, shifting rationales, and refusing to release the outside investigator's report.

73. The District's continuing refusal to produce responsive records has prevented Plaintiff from obtaining information necessary to understand the full scope of the misconduct.

19

Plaintiff reserves the right to supplement these allegations if additional information is later produced.

Grievance, Investigations, and Direct Misconduct

74.     Plaintiff's parents finally filed a formal grievance in May 2025, after countless attempts to resolve these issues internally and informally. The District retained outside counsel, Kriha Boucek, for investigation. That investigation confirmed violations of federal law, state law, and District policies. Nonetheless, senior administration, including Anderson, declined to discipline Defendant Kenyon, issued findings containing factual falsehoods, and attempted to block Plaintiff's parents from appealing under District Policy 2:260.

75.     The District falsely represented that it took steps to protect Plaintiff's identity in Kenyon's lawsuit. In fact, it had done nothing. This misrepresentation exemplifies the District's pattern of issuing assurances that were never carried out.

76.     District administrators, including Holland and Anderson, told Plaintiff's parents that appeals under Policy 2:260 were limited solely to the "finding," and they could not challenge the District's corrective actions or inaction. This interpretation contradicted the policy's plain language. These misrepresentations restricted Plaintiff's parents' ability to seek redress and reflect a pattern of obstructing fundamental procedural rights.

77.     Plaintiff's parents submitted an extensive appeal anyway, with exhibits and documentation, but the Board declined to correct the factual record, and allowed prior decisions to stand.

78.     Throughout this process, District administrators and counsel discouraged the Plaintiff's family from filing complaints or contacting administration, creating a chilling effect and putting Plaintiff's mental health at continued risk. These efforts to silence the Plaintiff's parents reflect retaliatory intent and the District's unwillingness to address staff misconduct.

20

79.     After receiving a written litigation-hold notice directing her to preserve all documents, communications, and electronically stored information relating to Plaintiff and the events at issue, Defendant Kenyon intentionally deleted or disabled portions of her social-media accounts and related content. This occurred after she was expressly instructed to retain all potentially relevant materials, including posts and communications that had been the subject of prior complaints and reflected her interactions with students, precisely the content relevant to boundary violations, retaliation, and inappropriate communications with minors.

80.     At the time Defendant Kenyon deleted this content – spoliating evidence -- the District had also received the litigation-hold notice and had an affirmative obligation to ensure that evidence within its custody and control, including that of its employees, was preserved. District leadership knew that Kenyon routinely used social media and electronic communications to interact with students, that she had previously been subject to complaints arising from those communications, and that the content was directly relevant to the allegations. Despite this knowledge, the District made no effort to secure or archive Kenyon's accounts. Predictably, relevant content was deleted or disabled after the hold was issued. The District's failure to enforce preservation obligations allowed relevant evidence to be altered or destroyed and is consistent with its broader pattern of disregarding complaints and minimizing legal violations.

81.     By failing to monitor compliance or implement custodial safeguards despite clear notice, the District made the loss of critical evidence not only foreseeable but a direct result of its policies and decisions. These actions constitute spoliation attributable to the District itself and have deprived Plaintiff of evidence central to establishing notice, pattern, retaliation, and boundary violations. The destroyed materials include the very category of evidence the District relied upon to justify returning Kenyon to student-facing duties, making the loss uniquely prejudicial.

21

82. Throughout these events, Plaintiff's parents made exhaustive efforts to resolve the situation internally and avoid escalation. They participated in numerous meetings, calls, and email exchanges with the current Superintendent, former Superintendent, Anderson, Chamberlin, Plaintiff's counselor, and multiple school board members. Despite encouragement from some personnel to file grievances or curriculum objections, Plaintiff repeatedly refrained to work collaboratively and avoid further turmoil for Plaintiff.

83. Despite Plaintiff's parents' extraordinary efforts, the District took no meaningful action to protect Plaintiff or address the escalating misconduct. These repeated failures compounded the trauma experienced by the Plaintiff and further demonstrate the District's refusal to intervene even when presented with clear opportunities.

84. In addition, despite statutory reporting obligations, the District failed to report Kenyon to the Illinois State Board of Education (ISBE) after the sexually explicit materials incident or after repeated privacy violations. School districts are required to promptly investigate and report educator misconduct involving inappropriate sexual materials, boundary violations, retaliation, or breaches of student confidentiality so ISBE can take appropriate licensure action and prevent concealment of misconduct. Multiple administrators with reporting duties had actual knowledge of Kenyon's conduct yet failed to notify ISBE or any other authority. This failure prevented external oversight, allowed Kenyon to remain in a student-facing role, and reflects an intentional decision to protect staff at the expense of student safety.

85. The District's failure to remove Kenyon from student-facing duties, even after she initiated personnel litigation arising from her own misconduct, is consistent with a broader custom of disregarding known risks.

86. In Illinois school districts, standard protocol is to place an employee on paid administrative leave when litigation implicates student welfare, boundary violations, or

confidentiality breaches. Despite clear notice of Kenyon's disclosures, retaliation, and refusal to accept responsibility, District 113 left her in active contact with students, including Plaintiff. By declining even this basic protective step, the District acted pursuant to a custom of deliberate indifference that foreseeably exacerbated the harm to Plaintiff and other students.

District Knowledge, Policy, and Custom (*Monell*)

87.     The violations in this case did not arise from an isolated personnel dispute or a single failure to respond to a parent complaint. Before and during the events involving Plaintiff, multiple unrelated parents reported similar concerns about Kenyon's disclosure of student information, boundary violations, and retaliatory behavior. District administrators, including Defendant Anderson and the school board, received these independent complaints yet declined to investigate or impose discipline. This consistent failure to act, combined with decisions to retain, promote, and protect the employees involved, reflects a longstanding custom of disregarding student privacy and failing to report educator misconduct, which directly caused the violations suffered by Plaintiff.

88.     In addition to Plaintiff's parents, other parents reported that Kenyon told students "what happens in R hall stays in R hall," discouraging open communication with parents and other adults, and that she created Snapchat groups with students and posted TikTok videos that mocked them in ways that made students identifiable. The District received these reports but did not initiate meaningful investigations or corrective action.

89.     The District had extensive, actual knowledge that Kenyon repeatedly engaged in privacy breaches, boundary violations, retaliation, and dissemination of confidential student information. Much of this misconduct was public, widely known in the community, and documented within the District. Multiple administrators, including current and former Superintendents, the building principal, current and former Human Resources/FOIA Officers,

Assistant Principals, and school board members, knew Kenyon posed an ongoing risk to student safety, privacy, and well-being. Despite this knowledge, the District chose not to remove or substantively discipline her. Instead, it settled with her, a step that reflects an affirmative choice to protect her from consequences rather than protect students.

90.     By resolving prior incidents through settlement and informal arrangements rather than formal discipline, the District avoided public accountability and corrective action. These decisions communicated to Kenyon that her behavior would be tolerated and shielded. The violations involving Plaintiff were therefore not unforeseen, but the predictable result of the District's refusal to act in the face of known risks.

91.     After the misconduct involving Plaintiff, the District engaged in a wave of concealment by withholding, delaying, and obstructing access to responsive records, including through misuse of FOIA exemptions, shifting legal justifications, inconsistent timelines, and failure to comply with FOIA deadlines. These acts had the effect, and likely the intent, of concealing the District's prior knowledge and preventing the public from learning the full extent of Kenyon's misconduct.

92.     Board members were personally informed of the misconduct affecting Plaintiff on numerous occasions over several years through emails, calls, meetings, and written grievance submissions. Despite this direct notice, the Board took no action to investigate, restrict Kenyon's access to students, or ensure compliance with federal and state law. As the final policymaking authority for District 113, the Board's failure to act after repeated notice constitutes ratification of the misconduct and the known risk of continued violations.

93.     The District's repeated failure to intervene, despite escalating misconduct and despite numerous opportunities to do so, reflects more than isolated error. Administrators at every level were repeatedly placed on notice of ongoing violations affecting Plaintiff and other students

24

yet took no meaningful action. The District's pattern of disregarding complaints, declining to investigate, and permitting Kenyon to remain in a student-facing role demonstrates a longstanding practice of deliberate indifference to student safety and privacy. Its refusal to report misconduct to ISBE and efforts to withhold or obscure information from parents and oversight entities further evidence a systemic custom of non-enforcement and non-intervention.

94. The District issued a Notice to Remedy to Kenyon following her disclosure of Plaintiff's information and related settlement, acknowledging that her conduct violated policy. Yet FOIA-produced records show that, both before and after issuing the Notice to Remedy, District leadership was aware of additional policy violations and serious breaches of FERPA, ISSRA, and District policy by Kenyon, including unauthorized disclosures, failure to safeguard protected data, and use of confidential records outside any legitimate educational context.

95. A Notice to Remedy imposes an obligation on the District to monitor compliance and take decisive action when new or previously undisclosed misconduct emerges. Despite this duty, the District took no further steps to investigate or discipline Kenyon for conduct equal to or more serious than the violations that triggered the Notice to Remedy itself. This failure demonstrates a systemic disregard for enforcing its own disciplinary directives.

96. After Plaintiff had graduated in fall 2025, Kenyon informed her current students that the senior "confessions" video would not occur this school year "because of" Plaintiff. The District undertook no steps to monitor Kenyon's compliance with directives or to address this retaliatory statement.

97. The violations in this case were not aberrational but the foreseeable product of the District's entrenched failure to supervise, evaluate, and discipline staff regarding student privacy, professional boundaries, mandatory reporting, and handling of sensitive information. For years, administrators at multiple levels received warnings about Kenyon's escalating misconduct yet

25

conducted no meaningful investigations or corrective action and shifted the burden onto affected families. These failures were so widespread and persistent that they became the District's standard operating procedure. This systemic breakdown directly caused the constitutional, statutory, and privacy harms suffered by Plaintiff.

98. Despite multiple warnings over an extended period, the District returned her to classroom instruction after Plaintiff graduated, knowingly exposing a new cohort of students to the same foreseeable harms. The deliberate decision to protect the employee rather than the students reflects an established custom of prioritizing staff interests over student safety and constitutes conscious institutional indifference that made Plaintiff's injuries not only foreseeable but inevitable.

99. Multiple parents unrelated to Plaintiff submitted complaints regarding Kenyon's boundary violations and disclosure of student information before and during the events involving Plaintiff. The District took no action in response, confirming that its failure to act was not an isolated oversight but part of a systemic custom of disregarding student privacy concerns.

100. Despite multiple reports of bullying, harassment, and student-to-student retaliation tied directly to Kenyon's disclosures, District 113 repeatedly concluded that each incident was "unsubstantiated" through superficial and structurally inadequate investigations. These "investigations" relied almost entirely on interviewing the child-victim and a handful of peers, students who, as the District knew or should have known, were unlikely to incriminate friends or disclose group behavior. The District failed to interview Kenyon, failed to interview the specific students she spoke to about Plaintiff, failed to identify root causes, failed to separate Kenyon from Plaintiff during investigations, and failed to take corrective action as reports continued. The repeated "unsubstantiated" findings were not evidence that bullying did not occur, but evidence of a District custom of conducting deliberately ineffective investigations designed to protect staff rather than students.

Harm, Liability and Ongoing Impact

101. As a student with a documented disability under Section 504, Plaintiff required accommodations to ensure equal participation in her educational program. The District was repeatedly informed, in writing and during meetings, that Plaintiff's disability substantially limited her ability to attend school consistently, focus in class, process information, complete assignments, participate in classroom activities, and engage socially without overwhelming distress. Her mental-health condition significantly affected major life activities including learning, concentrating, thinking, communicating, interacting with others, and regulating emotions and behavior. Despite this knowledge, the District failed to provide alternative means of access after Plaintiff was removed or effectively excluded from classroom and theater activities, denying her meaningful access to her educational program and interfering with her ability to benefit from legally required services.

102. Plaintiff's decline in class attendance, academic performance, and emotional stability was documented by her mental-health provider over several years and correlated with the District's failure to implement accommodations and its refusal to address Kenyon's retaliatory conduct. Chamberlin was aware of this decline given the extensive time Plaintiff spent in his office, missing class and discussing these issues.

103. Plaintiff's mental-health needs were neither speculative nor minor. Throughout high school, she required ongoing treatment and experienced self-harm ideation tied directly to school-related stressors. Defendant Anderson and Chamberlin were repeatedly informed that Plaintiff's anxiety and depression were exacerbated by conflict and social ostracization in the theater program, and that exposure to Kenyon's retaliatory conduct posed a serious risk to Plaintiff's emotional stability and safety.

104. Despite detailed information about Plaintiff's disability, functional limitations, and the impact of theater-related stressors, the District did not convene a 504 meeting to reassess

accommodations after extended social retaliation or after Kenyon's lawsuit and disclosures. Nor did it develop any safety or transition plan when Plaintiff was removed or effectively excluded from classes and theater activities. Instead, the District repeatedly suggested that Plaintiff withdraw from the program that was central to her educational and emotional life, without offering equivalent alternatives or supports. This failure to adjust accommodations or provide equal access, despite clear notice of the effect on Plaintiff's mental health and participation, denied her the meaningful access required under Section 504.

105. Plaintiff's mental health and educational functioning deteriorated in parallel with and caused by the District's failures to intervene. Her anxiety and depressive symptoms intensified, necessitating increased therapy, medication changes, and additional missed classes. After and because of Kenyon's public lawsuit, disclosures, and retaliatory conduct, Plaintiff experienced heightened panic attacks, avoided school spaces associated with theater, and ultimately withdrew from activities that had been a core part of her identity and support system. The bullying and harassment that followed were not an independent intervening cause, but a direct and foreseeable consequence of Kenyon's disclosures and comments, which signaled to students that such treatment was acceptable and justified.

106. As a direct result of the Defendants' Kenyon, Anderson, and the District's conduct, Plaintiff suffered severe emotional trauma, psychological harm, academic regression, increased therapy and medication needs, loss of trust in school administration, years of bullying and ostracization, and a hostile learning environment.

107. Kenyon acted intentionally, maliciously, and with reckless disregard for Plaintiff's privacy, dignity, and safety. At the time of the disclosures at issue, Kenyon knew that sharing a student's confidential mental-health information, personally identifiable information, or protected education records is prohibited under FERPA, ISSRA, and District policy. She had received

training, directives, and warnings regarding confidentiality. Despite this, Kenyon knowingly and publicly disclosed Plaintiff's confidential mental-health condition and other private information to third parties with no legitimate educational purpose and without consent, in a manner she knew would humiliate, stigmatize, and harm Plaintiff. Her actions were neither negligent nor accidental; they were purposeful violations undertaken with full awareness of their impropriety.

108.    Before and after Kenyon filed her personnel lawsuit, Plaintiff's parents repeatedly reported concerns to multiple administrators and board members about Plaintiff's safety, especially in light of increased bullying tied to Kenyon's disclosures. At no point did the District restrict Kenyon's access to Plaintiff, supervise their interactions, or implement safety planning. Neither Anderson nor Chamberlin can credibly claim that these developments were unexpected: each had received repeated, detailed warnings about Kenyon's conduct, the pattern of parent complaints, and the resulting risk. Their failure to intervene, despite sustained notice, reflects systemic disregard.

109.    Over several years, Plaintiff's parents exhausted every internal avenue to address the repeated unlawful disclosures and retaliation involving Plaintiff, including multiple meetings, appeals, and good-faith efforts to avoid litigation. During this period, Plaintiff experienced significant emotional distress, humiliation among peers, and deterioration in her educational experience, all directly attributable to the District's conduct and its failure to intervene.

110.    In sum, the District's failures were neither isolated nor inadvertent. Over a prolonged period, administrators with final or delegated authority received clear, repeated, contemporaneous notice of the risks to Plaintiff, ongoing misconduct by Kenyon, and the District's own noncompliance with mandatory student-protection and recordkeeping requirements. Despite this notice, they chose to disregard warnings, depart from established procedures, and act in a manner consistent with a broader District practice of minimizing staff misconduct, discounting

29

parent reports, and failing to intervene when required. These actions and omissions, taken by multiple decision makers and reflective of an established custom, constitute deliberate indifference to known and obvious risks. The harm Plaintiff suffered was the direct and plainly foreseeable result of these institutional practices and the District's conscious refusal to act on information squarely before it.

## V. Causes of Action

### Count I — 42 U.S.C. §1983 Violation of Fourteenth Amendment Right to Informational Privacy
### (Against Defendant Kenyon in her Individual Capacity and Against District 113)

111.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

112.    The Fourteenth Amendment protects an individual's right to informational privacy, including the right to prevent the disclosure of highly personal and confidential information, such as mental health diagnoses, treatment history, and disability status.

113.    At all relevant times, Defendants had actual knowledge that Plaintiff's mental health information, Section 504 disability status, accommodations, and related educational records constituted confidential information protected under federal and state law, including FERPA, ISSRA, and District policy.

114.    At all relevant times, Defendant Kenyon acted under color of law as an employee of Defendant District. Defendant Kenyon intentionally disclosed Plaintiff's confidential mental health information, disability-related accommodations, and personally identifiable educational information to third parties, including parents and students who had no legitimate educational interest and no authorization to receive such information.

115.    Kenyon further publicly disclosed Plaintiff's confidential information in her personal lawsuit, including identifying Plaintiff and family by name, referencing her mental health

disability, and attaching or referencing student-record information, without consent and for retaliatory, non-pedagogical purposes.

116. These disclosures were not accidental, negligent, or incidental; they were intentional acts undertaken with full knowledge of the confidential nature of the information and with reckless disregard for the privacy, dignity, and safety of a minor student.

117. The disclosure of Plaintiff's confidential mental health information and disability status caused foreseeable harm, including social ostracization, bullying, emotional distress, humiliation, and deterioration in Plaintiff's mental health and educational access.

118. At all relevant times, the District, through its administrators and final policymakers, had actual knowledge of Kenyon's disclosures and the resulting harm to Plaintiff, yet failed to take corrective action, discipline Kenyon, restrict her access to students, or implement safeguards to prevent further disclosures.

119. The District's refusal to intervene after acquiring actual notice constituted deliberate indifference to Plaintiff's constitutional right to informational privacy.

120. As a direct and proximate result of Defendants' actions and omissions, Plaintiff suffered severe emotional and psychological harm, educational deprivation, and damage to her privacy interests, entitling Plaintiff to compensatory and punitive damages, declaratory relief, and such other relief as the Court deems just.

## Count II — 42 U.S.C. §1983 – Failure to Train and Supervise
### (Against Township High School District 113)

121. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

122. The constitutional violations described above were caused by Defendant District 113's policies, customs, and practices, including its failure to train and supervise employees

regarding confidentiality, student privacy, mandatory reporting, retaliation, and handling of sensitive student information.

123. The District had actual knowledge that Kenyon repeatedly engaged in misconduct involving disclosure of confidential student information, boundary violations, retaliation against students, and misuse of student records, yet failed to properly investigate, discipline, or restrict her access to students.

124. Despite repeated notice of prior incidents, public and private complaints from multiple parents, and internal communications, the District failed to provide training or supervision reasonably necessary to prevent further violations.

125. The District's decision to promote Defendant Anderson, who had previously disregarded complaints, forwarded confidential information to Kenyon, and mishandled privacy violations, to positions responsible for Human Resources and FOIA compliance constitutes ratification of the misconduct and deliberate indifference to the known risk of continued violations.

126. The District maintained a widespread practice and custom of ignoring confidentiality breaches, failing to report educator misconduct to state authorities, minimizing parental complaints, displacing affected students rather than restricting staff, and withholding information from parents and oversight bodies.

127. This practice was so persistent and widespread that it constituted the District's standard operating procedure and reflects deliberate indifference to the constitutional and educational rights of students, including Plaintiff. The District repeatedly chose to protect the employee rather than the student, making the resulting violations not merely foreseeable, but inevitable.

128.     The District's failure to train and supervise staff regarding confidentiality and retaliation was the moving force behind the constitutional violations suffered by Plaintiff, including the public disclosure of her confidential information, retaliation, and resulting harm.

129.     As a direct and proximate result of the District's policies, customs, and deliberate indifference, Plaintiff suffered the constitutional injuries described herein, including violation of her informational privacy rights, emotional harm, educational deprivation, and loss of access to a safe learning environment.

130.     Plaintiff is entitled to compensatory damages, declaratory and injunctive relief, attorneys' fees, and such other relief as the Court deems just.

### Count III – Public Disclosure of Private Facts (Illinois Common Law)
### (Against Defendant Kenyon, Individually)

131.     Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

132.     Defendant Kenyon publicly disclosed private, highly sensitive, and deeply personal information about Plaintiff, including her mental health history, Section 504 disability status, accommodations, and details relating to emotional distress. The disclosed information is not generally known.

133.     At all relevant times, Kenyon knew that this information was confidential, protected under federal and state law, and shared with her solely in her role as Plaintiff's teacher and trusted adult within the school community.

134.     Despite this knowledge, Kenyon disclosed these private facts in a publicly filed lawsuit in state court, identifying Plaintiff and linking her to protected disability information, without consent and with full awareness that the information could become accessible to parents, students, and the broader community.

135. Kenyon further shared information about Plaintiff's disability and protected mental health history with other parents and students in private conversations and electronic communications, including statements intended to assign blame to Plaintiff and her family for the professional consequences Kenyon faced.

136. These disclosures had no legitimate educational purpose and were made for personal reasons, including retaliation, self-justification, and efforts to garner support within the school community at Plaintiff's expense.

137. Disclosure of a minor student's mental health status, disability documentation, and confidential educational information would be highly offensive and devastating to any reasonable person, particularly when the disclosure occurred in a public forum and within the student's own peer community.

138. As a direct and foreseeable result of Kenyon's disclosures, Plaintiff experienced renewed bullying, social ostracization, humiliation, and emotional deterioration, including increased anxiety, panic attacks, withdrawal from school activities central to her identity, and intensified mental health treatment needs.

139. Kenyon's conduct exploited the profound trust placed in educators to protect vulnerable students and weaponized private information that she obtained solely through her professional position.

140. Kenyon acted intentionally, maliciously, and with reckless disregard for Plaintiff's dignity, privacy, and emotional safety.

141. Kenyon's conduct constitutes public disclosure of private facts under Illinois law.

142. Plaintiff suffered severe emotional distress and damages because of Kenyon's conduct, including reputational harm, social harm, and psychological injury.

143. Plaintiff is entitled to compensatory damages, and because Kenyon's actions were willful, wanton, and malicious, Plaintiff is further entitled to punitive damages under Illinois law.

### Count IV – Willful and Wanton Misconduct
### (Against Defendant Kenyon, Individually)

144. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

145. At all relevant times, Defendant Kenyon owed Plaintiff a duty to act with reasonable care in safeguarding her privacy, emotional well-being, and safety as a minor student entrusted to her supervision.

146. Kenyon was fully aware that Plaintiff had a documented mental health disability, including anxiety, depression, and a history of self-harm, and that Plaintiff was particularly vulnerable to emotional distress, social ostracization, and peer harassment.

147. Despite this knowledge, Kenyon intentionally engaged in conduct that demonstrated a conscious disregard and utter indifference to Plaintiff's safety and emotional welfare, including publicly disclosing Plaintiff's confidential disability information, distributing sensitive student information to parents and students, and directing blame toward Plaintiff for Kenyon's own personnel issues.

148. Kenyon knowingly violated explicit directives from District counsel instructing her not to discuss her personnel litigation with students and not to engage with Plaintiff regarding the lawsuit, yet she initiated multiple conversations with Plaintiff, including a prolonged hallway encounter that left Plaintiff traumatized.

149. Kenyon further encouraged secrecy among students by instructing them that "what happens in R Hall stays in R Hall," fostering an environment that discouraged reporting and increased risk of harm to vulnerable students.

150.    Kenyon publicly filed court documents identifying Plaintiff and linking her confidential mental health and disability information, fully aware that doing so would expose Plaintiff to humiliation, bullying, and emotional harm within her peer community.

151.    These actions were undertaken not for any legitimate educational purpose, but for personal motives, including retaliation, self-preservation, and efforts to garner sympathy and support within the community at Plaintiff's expense.

152.    Kenyon's conduct was willful and wanton, demonstrating a conscious disregard and deliberate indifference to the rights and safety of Plaintiff, a minor student who relied on her for protection and professional judgment.

153.    As a direct and foreseeable result of Kenyon's willful and wanton misconduct, Plaintiff suffered severe emotional trauma, increased anxiety and depression, withdrawal from educational and extracurricular activities central to her identity, humiliation among peers, and deterioration in her mental-health functioning.

154.    Plaintiff incurred additional therapy expenses, legal costs, and suffered profound distress due to Kenyon's actions.

155.    Kenyon's conduct was willful, wanton, malicious, and undertaken with reckless disregard for Plaintiff's rights, entitling Plaintiff to compensatory and punitive damages under Illinois law.

### Count V – Section 504 of the Rehabilitation Act – Disability Discrimination / Denial of Meaningful Access / Failure to Accommodate and/or Inadequate Accommodation (Against Township High School District 113)

156.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

157. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits recipients of federal financial assistance from excluding, denying benefits to, or otherwise discriminating against individuals with disabilities solely by reason of their disability.

158. Defendant District 113 is a recipient of federal financial assistance and is subject to Section 504 and its implementing regulations.

159. Plaintiff is an individual with a disability within the meaning of Section 504 due to her documented anxiety, depression, and history of self-harm, which substantially limit major life activities including learning, concentrating, thinking, communicating, interacting with others, and regulating emotions and behavior.

160. The District had actual knowledge of Plaintiff's disability and functional limitations through her Section 504 plan, medical documentation, meetings, written communications, and direct reports from Plaintiff's parents and Plaintiff's mental health providers.

161. Despite this knowledge, the District failed to provide Plaintiff with meaningful access to her educational program after she was removed or effectively excluded from classroom and theater activities and failed to implement reasonable modifications or accommodations necessary for her continued participation.

162. The District refused to convene additional Section 504 meetings or adjust accommodations following escalating retaliation, bullying, and emotional deterioration, despite repeated notice that Plaintiff's disability related needs had changed substantially.

163. Instead of ensuring equal access, the District repeatedly proposed removing Plaintiff from theater, the only activity in which she experienced emotional support and academic engagement, without offering equivalent alternatives or supports.

164.     As a direct result of the District's actions and omissions, Plaintiff was denied meaningful access to educational opportunities and programs, experienced academic regression, emotional harm, and was deprived of the benefits of her education solely based on her disability.

165.     Plaintiff is entitled to compensatory damages, equitable relief, attorneys' fees, and such other relief as the Court deems just.

### Count VI – Section 504 Retaliation
### (Against Township High School District 113)

166.     Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

167.     Section 504 prohibits retaliation against individuals who engage in protected activity, including reporting disability discrimination or advocating for accommodations.

168.     Plaintiff and her parents engaged in protected activity when they reported misconduct by Kenyon, raised concerns about Plaintiff's safety and privacy, requested accommodations, and advocated for Plaintiff's rights under Section 504.

169.     In response to this protected activity, District staff, including Kenyon and administrators acting within their official roles, engaged in retaliatory conduct, including but not limited to:

a. disclosing confidential disability-related information,

b. encouraging social ostracization,

c. denying Plaintiff opportunities within the theater program,

d. refusing to provide accommodations, and

e. pressuring Plaintiff to leave theater programs entirely.

170. The District failed to properly investigate or address retaliation complaints and instead repeatedly proposed removing Plaintiff from the very program that she and her parents sought to make accessible.

171. The District's failure to intervene and its repeated displacement of the minor student rather than the staff member causing harm constitute adverse actions that would deter a reasonable person from asserting disability rights.

172. The retaliatory conduct caused Plaintiff serious emotional harm, humiliation, social exclusion, and loss of educational access.

173. Plaintiff is entitled to compensatory damages, equitable relief, attorneys' fees, and such other relief as the Court deems just.

## Count VII – Illinois School Student Records Act (ISSRA) and State-Law Privacy Violations (Against All Defendants Except the Board)

174. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

175. ISSRA, 105 ILCS 10/1 *et seq.*, prohibits the disclosure of student records and personally identifiable student information without parental consent or a valid statutory basis.

176. Plaintiff's confidential mental-health information, disability status, Section 504 accommodations, and educational information constitute student records and personally identifiable information within the meaning of ISSRA.

177. Defendants disclosed Plaintiff's confidential student information to third parties without consent, authorization, or legitimate educational purpose, including to parents and students.

178.    Defendants' disclosures were intentional, reckless, and outside any legitimate educational function.

179.    Plaintiff suffered emotional distress, humiliation, reputational harm, and educational injury as a result. The District repeatedly chose to protect the employee rather than the student, making the resulting violations not merely foreseeable, but inevitable.

180.    Plaintiff is entitled to damages under Illinois law.

### Count VIII – Failure to Supervise / Willful and Wanton Conduct
### (Against Township High School District 113)

181.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

182.    The District owed a duty to exercise reasonable care in hiring, retaining, supervising, and disciplining employees who interact with students, particularly those with known disabilities and vulnerabilities.

183.    The District had actual knowledge of repeated misconduct by Kenyon, including:

a. dissemination of sexually explicit materials to a minor student,

b. unauthorized disclosure of confidential student information,

c. boundary violations with students,

d. retaliation against a student and family, and

e. violations of confidentiality and other directives.

184.     Despite actual notice, the District failed to investigate, discipline, or restrict Kenyon's access to students, and instead affirmatively returned her to student-facing duties without safeguards.

185.    The District's failure to supervise and intervene, including returning Plaintiff to Kenyon's care despite knowing of the numerous instances of misconduct constituted willful and

wanton conduct, demonstrating deliberate indifference to or a conscious disregard for the safety and rights of Plaintiff.

186.     As a direct and proximate result, Plaintiff suffered emotional trauma, educational harm, and ongoing psychological injury.

187.     Plaintiff is entitled to compensatory damages under Illinois law.

### Count IX - Intentional Infliction of Emotional Distress
### (Against Kenyon)

188.     Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

189.     Kenyon engaged in extreme and outrageous conduct, including:

a. providing sexually explicit material to a minor student,

b. publicly disclosing confidential mental health and disability information,

c. encouraging and participating in retaliatory harassment,

d. confronting and engaging Plaintiff about litigation,

e. naming Plaintiff and Plaintiff in public legal filings without redaction.

190.     Kenyon knew that Plaintiff suffered from severe anxiety, depression, and self-harm history.

191.     Kenyon's conduct was intentional or in reckless disregard of the high probability that emotional distress would result.

192.     As a direct result, Plaintiff suffered severe emotional distress, including panic attacks, depression, and withdrawal from school activities central to her identity.

193.     Plaintiff is entitled to compensatory and punitive damages.

## Count X – Declaratory and Injunctive Relief – FOIA
### (Against Township High School District 113)

194.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

195.    The Illinois Freedom of Information Act, 5 ILCS 140/1 et seq., requires public bodies to provide access to public records unless a valid statutory exemption applies.

196.    Plaintiff, through her parents, submitted multiple FOIA requests seeking records relating to:

a. investigations involving Plaintiff,

b. disciplinary actions,

c. privacy breaches, and

d. communications by District officials.

197.    The District:

a. delayed responses,

b. shifted exemption rationales,

c. invoked inapplicable exemptions,

d. produced only fragments of responsive documents, and

e. withheld the outside investigator's report.

198.    These actions constitute a pattern of improper denial and obstruction under FOIA.

199.    Plaintiff is entitled to:

a. declaratory relief that the District violated FOIA, and

b. injunctive relief requiring the District to produce all non-exempt responsive records and comply with FOIA going forward.

200. Plaintiff does not seek damages or affirmative enforcement of the Illinois Freedom of Information Act in this action. Instead, Plaintiff seeks declaratory relief that the District's repeated refusal to disclose records relating to prior complaints, investigations, and privacy violations, while simultaneously promoting the administrator responsible for those decisions, constitutes evidence of concealment relevant to Plaintiff's federal claims, including notice, deliberate indifference, and Monell liability.

201. Plaintiff further seeks an order requiring the District to preserve all responsive records during the pendency of this litigation and prohibiting the destruction or alteration of records subject to existing FOIA requests.

## VI. Jury Demand

Plaintiff respectfully demand a trial by jury.

## VII. Prayer for Relief

THEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against all Defendants, and award the following relief:

Monetary Relief

A. Compensatory damages in an amount to be determined at trial for emotional distress, humiliation, loss of educational opportunities, and all other injuries sustained because of Defendants' conduct

B. Punitive damages against Defendant Kenyon for her reckless, malicious, and deliberate disregard of Plaintiff's rights.

C. An award of reasonable attorney's fees, expert fees, and costs.

D. Pre-judgment and post-judgment interest as permitted by law.

Injunctive Relief

A.  Requiring the District to conduct a comprehensive review of Plaintiff's cumulative and Section 504 records;

B.  Requiring removal, correction, or written annotation of any inaccurate or retaliatory notations;

C.  Requiring written confirmation that no record attributes fault to Plaintiff for Defendants' personnel or disciplinary matters.

D.  Requiring the District to provide Plaintiff with an accounting of disclosures of her education records;

E.  Requiring identification of the categories of individuals who accessed or received her records and the asserted legal basis for each disclosure.

F.  Prohibiting further disclosure of Plaintiff's personally identifiable education records or disability-related information except as strictly permitted by law.

G.  Requiring the District to implement safeguards ensuring that Plaintiff's records are protected from unauthorized internal or external dissemination.

H.  Limiting access to Plaintiff's education records to individuals with a legitimate educational interest;

I.  Prohibiting Defendant Kenyon from referencing or disclosing Plaintiff's confidential information in any educational or public setting;

J.  Requiring Conflict-free administrative review of any future record dispute concerning Plaintiff.

Declaratory Relief

A. A declaration that Defendants' disclosure of Plaintiff's confidential mental-health, disability, and educational information violated her rights under the Fourteenth Amendment, 42 U.S.C. § 1983, Section 504 of the Rehabilitation Act, and applicable state law.

B. A declaration that Defendant District 113, after receiving repeated notice of privacy breaches and retaliation, acted with deliberate indifference to Plaintiff's constitutional and statutory rights.

C. A declaration that the District's failure to protect Plaintiff's educational access and confidentiality constituted a violation of federal disability protections.

Such other legal or equitable relief as this Court deems just and proper.


Dated: March 3, 2026                    Respectfully submitted,

                                        */s/ Michael R. La Porte*
                                        Michael R. La Porte
                                        Dunlap Bennett & Ludwig
                                        333 N. Michigan Avenue, Suite 2700
                                        Chicago, IL  60601
                                        T:  312-551-9500
                                        mlaporte@dbllawyers.com

                                        **Attorneys for Plaintiff,**
                                        **JL**


45